IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| v. | ) | No. 11 CR 718 |
| | ) | Judge Virginia M. Kendall |
| JASON PALOMINO | ) | |

**MEMORANDUM OPINION AND ORDER**

Defendant Jason Palomino presented to the Government an expert witness report the week prior to trial in this case seeking to have Steven Howard testify as an expert in the field of gunshot residue and cross-contamination of that residue that may occur when items are not preserved properly during the collection process. The Court provided the Defense with the opportunity to contact and pay for an expert to testify for Palomino nine months prior to trial. His Defense attorney provided the government and the Court with the expert report ten days prior to trial and a supplemental report three days prior to trial during the Daubert hearing that this Court ordered upon receiving the report. The Government has moved to exclude the testimony alleging that it is unreliable and based on speculation and therefore cannot be helpful to a jury. Instead, the Government urges this Court to exclude the testimony because it will be overly prejudicial to the jury if the jurors receive such unreliable evidence and believe that it should be given the same weight as that of other scientific evidence. In keeping with its gate-keeping function, this Court ordered a Daubert hearing to be held the Friday prior to trial and ordered briefs from both sides.

After listening to the testimony of the Defense expert, Steven Howard, and the evidence presented at the hearing, the Court grants the Government's motion in part and denies it in part. Howard will be permitted to testify based on his experience in the physical collection of gunshot residue procedures and the proper protocol for such collection; but he will be barred from testifying regarding the potential cross-contamination of items and transfer of gunshot residue because Howard failed to identify any reliable principles, methods, or data upon which his opinions are based concerning the transference of gunshot residue between surfaces and the probability of cross-contamination of items.

## LEGAL STANDARD

Federal Rule of Evidence 702 governs the admissibility of expert testimony. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 588 (1993). *Daubert's* gatekeeping obligation applies not only to "scientific" testimony, but to all expert testimony. *See Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147 (1999). Rule 702 permits an expert to offer opinions that will assist the trier of fact provided sufficient facts or data support the expert's opinions and reliable principles and methods applied to the facts of the case produced those opinions. Fed. R. Evid. 702; *Ortiz v. City of Chicago*, 656 F.3d 523, 526 (7th Cir. 2011). When assessing whether to allow an expert to offer his opinions, courts consider: (1) whether the expert is qualified to offer his opinions; (2) whether the reasoning or methodology underlying the expert's opinion is reliable; and (3) whether the expert's opinions will assist the trier of fact. *Myers v. Ill. Cent. R.R. Co.*, 629 F.3d 639, 644 (7th Cir. 2010).

## DISCUSSION

Steven Howard is an attorney and security and firearms consultant who graduated from Thomas M. Cooley School of Law in 2001. Howard holds a degree in Criminal Justice from

Metropolitan State College of Denver from 1998. He has worked as a consultant on matters related to firearms and held a previous position with the United States Border Patrol as a Field Agent where he received training in the collection and preservation of evidence. Howard testified that his undergraduate degree also provided him with evidence collection training. As a firearms consultant, Howard has conducted gunshot residue and cross-contamination "investigations," as he calls them.

Between 1992 and 1994, Howard testified that he conducted approximately 280 individual gunshot residue cross-contamination tests for his own personal knowledge. Howard testified he conducted these tests for his own edification and that he never wrote up the results of these tests for any scientific journals. He stated that during this time period, he examined numerous materials and surfaces for gunshot residue cross-contamination. He stated that he has testified as an expert witness approximately six times pertaining to gunshot residue collection or cross-contamination—all of which were in state court matters. He has never testified as an expert in federal court and he stated he may have testified more than that but be does not always catalog his testimony on his curriculum vitae. Howard has written two articles in the field of gunshot residue collection and cross-contamination—both of which were written to warn of the potential for cross-contamination. Both were written from a consultant's perspective to challenge law enforcement's use of gunshot residue.

The gunshot residue tests at issue in this criminal trial involve tests performed by the police shortly after the shooting which detected three unique particles: lead, barium, and antimony on the Defendant's hands. To rebut this testimony, Howard was retained by the Defendant to investigate and analyze gunshot residue evidence on a grey sweatshirt allegedly worn by the defendant the night of the shooting. To conduct his independent test, Howard took

precautions before collecting samples from the clothing for gunshot residue analysis. First, Howard washed his hands and face, wet his hair, put on a new shirt taken from a sealed bag, and put on rubber gloves. He then proceeded to collect three samples from the sweatshirt for gunshot residue analysis. Howard sent these samples to the R.J. Lee Group for gunshot residue analysis. The undisputed results of the testing showed zero gunshot residue particles on the three samples taken from the sweatshirt.

In his report, Howard opines: (1) no gunshot residue was recovered from the sweatshirt samples; (2) a porous cloth garment will retain gunshot residue better than skin; (3) given the number of shots fired, ten or more gunshot residue particles should have been recovered from the Defendant's hands; (4) the tests documented in *Gunshot Residue in Chicago Police Vehicles and Facilities: An Empirical Study*[1] (the "Chicago study") parallel the independent tests he conducted between 1992 and 1994; (5) according to the Chicago study, there is over an 11.5 percent chance that the Defendant was contaminated by gunshot residue from a source other than the firearm the moment he was placed in the squad car; (6) many police departments require cross-contamination procedures to be followed or the precinct's forensic unit will forego testing for gunshot residue. He therefore reaches the ultimate expert opinion that it is unlikely the Defendant discharged a firearm or was in the immediate area where a firearm was discharged. Instead, he concludes that any particles found on the Defendant would have come from an alternate source.

This Court will analyze the appropriateness of Mr. Howard's testimony with respect to each of these opinions in turn.

[1] *See* Journal of Forensic Sciences, Vol. 52, Issue 4, P. 838-841 (July 2007)

### A. No Gunshot Residue was Recovered from the Sweatshirt Samples

Howard has some experience in the field of collection of gunshot residue. He has conducted collection in the past, has been trained on how to collect residue properly both during his education and during his time as a federal agent. He has reviewed current texts on how to collect residue properly. The proper collection of gunshot residue for later lab testing is an area of law enforcement evidence gathering that is outside the ken of the average juror and therefore his testimony will be helpful to the jury. The fact that he has not performed the actual testing on the residue will narrow his testimony significantly and his limited role in law enforcement certainly will be fodder for cross examination but both go to the weight of the testimony and not to its admissibility. Therefore, he will be permitted to discuss the proper collection and preservation of collected materials for laboratory testing. Based on his experience and education, Howard is qualified to discuss the procedures he used examining the sweatshirt and the results of the analysis conducted by the laboratory.

### B. A Porous Cloth Garment Will Retain Gunshot Residue Better than Skin

Howard opines that "[c]ommon sense tells us that a porous cloth garment will certainly hold gunshot residue particles and the two-component particles that accompany gunshot residue far better than smooth skin will." If this is truly in the realm of common sense, then Howard's expert testimony is superfluous and will provide no benefit to the trier of fact. However, if this opinion is instead based on specialized knowledge that Howard has learned within the field of gunshot residue analysis, then his opinion may assist the jury. Howard may testify to his opinion that cloth retains gunshot residue better than skin provided he can lay the proper foundation for such a conclusion. This opinion is proper to the extent it is based on sufficient facts and data that Howard can reference in his testimony.

**C. Given the Number of Shots Fired, Ten or More Gunshot Residue Particles Should Have Been Recovered from the Defendant's Hands**

Six shell casings were recovered by the police in their investigation of the underlying incident. Howard contends that given this number of shots and the short period of time between the discharge of the firearm and the testing of the Defendant's hands for gunshot residue, a higher particle count should have been detected on the Defendant's hands. He bases this conclusion on his findings stemming from his 280 individual gunshot residue cross-examination tests conducted between 1992 and 1994. This conclusion is not properly supported because Howard has not shown that his individual study was performed using reliable methods and procedures. Accordingly, Howard is not qualified to testify that ten or more gunshot residue particles would have been found on the Defendant's hands had he fired the gun.

To be admissible, an expert scientific opinion must be grounded in the "methods and procedures of science," and must consist of more than simply "subjective belief or unsupported speculation." *See Daubert*, 509 U.S. at 589. Here, Howard has offered nothing more than speculation and conjecture because he has failed to demonstrate that his independent research was executed using reliable methods. Howard never conducted any tests, documented any results, or used any scientific analysis to reach his conclusion. Howard has not presented the Court with any specifics whatsoever concerning his independent tests. He did not publish his results. He did not subject his procedures or his results to peer review. The Court is therefore incapable of making the determination that Howard used reliable methods in his tests spanning from 1992 to 1994 because he has not provided any details regarding the study. *See Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 705 (7th Cir. 2009) (the proponent of the expert bears the burden of demonstrating that the expert's testimony satisfies the *Daubert* standard). Although his expert conclusion not only relies on the scientific transfer of particles from one surface to

another, and actually reaches a conclusion based on probability, Howard has no experience in scientifically analyzing that transfer of particles other than looking through an atomic microscope that his friend allowed him to use once and one time conducting a two day experiment wherein he did not wash his hands to see if particles remained on them. Even the two day experiment is not documented. Because the reliability of Howard's individual testing has not been established and could hardly pass peer review since it is not documented and is not based on testing, he is not qualified to testify to his conclusion that more gunshot residue particles would have been found on the Defendant's hands had he fired the gun.

**D. The Chicago Study Tests Parallel Howard's Independent Tests**

For the same reasons as stated in the section above, this opinion cannot be substantiated based on the information provided by Howard. In fact, the Chicago study provides an excellent contrast to the information provided by Howard in the present case. The Chicago study was published and supported by substantial statistical and scientific detail concerning the methodology behind its conclusions, whereas Howard's tests were unpublished and he has provided no specifics regarding the procedures and protocol he used. For example, the Chicago study details its methods used:

> Samples were collected from 193 vehicles and detention facilities. After the initial samples were analyzed, eight additional samples were taken from multiple locations in two of the facilities. Samples were collected using SEM GSP kits manufactured by Tri-Tech Incorporated (Southport, NC). The sample stubs are 1/2 inch aluminum circles covered with conductive adhesive tape. In actual casework, these stubs are used to collect evidence from the backs of the suspects' hands. These stubs are applied to the sample surface using a repeated dabbing motion. In our study, random sampling was performed and a large number of particles were collected. As the tape picks up trace materials, the tackiness of the tape decreases. The dabbing continued in the area that the suspects' hands could have contacted until the adhesive tape was no longer tacky. No additional sample preparation was necessary.

Journal of Forensic Sciences, Vol. 52, Issue 4, P. 838-841 (July 2007). On the other hand, Howard testified at the hearing that he "conducted just under 300 individual gunshot residue cross-contamination tests" by "basically testing just about everything. Everything from patrol cars and desk tables to chairs and holding cells, lockers, uniforms, police equipment of every description." Without delving into the procedure used, Howard has not adequately shown that the Chicago study "parallel[s] many of [his] independent tests." *See General Elec. v. Joiner*, 522 U.S. 136, 146 (1997) ( "Nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert). Unable to offer specifics concerning the methods used in his independent research between 1992 and 1994, Howard has failed to provide any indicia of relatedness between his study and the Chicago study. There is no way for a cross-examiner to explore the efficacy of his study if the methods and steps are not set forth. Therefore, Howard may not compare the studies in his testimony.

**E. According to the Chicago Study, There is Over an 11.5 Percent Chance that the Defendant was contaminated by Gunshot Residue the Moment he was Placed in the Squad Car**

Using the Chicago study as a parallel, Howard concludes that "there is just over an 11.5% chance that the accused became contaminated with the gunshot residue from other sources the moment he was placed in the police car." Howard bases this opinion on the results of the Chicago study, which found 23 out of 201 samples taken from Chicago Police Department vehicles and detention facilities to be contaminated with gunshot residue. First, comparing the study to his work fails to pass scientific analysis. The Chicago study found 11.5 percent of its samples were tainted with gunshot residue from outside sources and therefore Howard wants to transfer that same conclusion to an entirely difference police station, at a different time, without

taking into account the multitude of factors that would impact the parallel. The Defendant was arrested by the Joliet Police Department, placed in a Joliet squad car, and taken to a Joliet police station. The Chicago study contains no information or statistics on any precincts outside of Chicago, and likewise, Howard has conducted no research on his own. He did not test any Joliet squad cars. He does not know how often the cars are cleaned. He did not examine the police station where the Defendant was taken. Unable to point to personal experience or industry studies that support his opinion, Howard has failed to provide any indicia of reliability as to his opinions. *See Cummins v. Lily Indus.*, 93 F.3d 362, 268 (7th Cir. 1996) (proposed testimony must be supported by appropriate validation).

Howard can, however, testify that in theory, cross-contamination can occur. He can speak generally of the occurrence provided he lays a proper foundation. He may cite to the Chicago study for its findings and explain its results. But without conducting tests of objects and surfaces the Defendant in this case plausibly could have come into contact with, Howard lacks sufficient facts and data to claim that there was an 11.5 percent chance that the Defendant was contaminated as soon as he sat in the squad car.

**F. Many Police Departments Require Cross-Contamination Procedures to be Followed or They Will Forego Gunshot Residue Testing**

Howard has provided absolutely no facts to support this opinion other than his conclusion that it is so. His report does not say where he gleaned this information, what police departments (outside of his single example of Boston, Massachusetts) maintain these procedures, what the procedures entail, or who informed him of the procedures. "An expert who supplies nothing but a bottom line supplies nothing of value to the judicial process." *Wendler & Ezra, P.C. v. Am. Int'l Group, Inc.*, 521 F.3d 790, 791 (7th Cir. 2008) (quoting *Mid-State Fertilizer v. Exchange*

*Nat'l Bank*, 877 F.2d 1333, 1339 (7th Cir. 1989). Howard has not shown that he is qualified to provide this opinion because he points to no facts supporting its veracity.

**G. Ultimate Conclusion that the Defendant was Cross-Contaminated**

The problem with the "expert" testimony that Howard seeks to present to the jury is that it is not "expert" at all. The various steps that lead up to his conclusion are not steps that any other individual can test or validate because he has not documented those steps, nor has he gone through any scientific or empirical process that would enable another individual to test his theory. Therefore, his conclusion results in essentially lay person opinion testimony: because I have read that this can occur, I assume it occurred here. This is not helpful to a jury and, in fact, can be quite dangerous because it has all the trappings of expert opinion testimony without the ability for others to test that opinion. It is for that reason that he cannot make the ultimate conclusion that cross-contamination occurred in this case.

For the reasons stated above, Howard has not provided the Court with sufficient facts or data that support his cross-contamination opinion. Nor has he identified any reliable reasoning or methodology that supports this opinion. Howard is qualified to discuss cross-contamination generally, provided that he can lay the proper foundation by pointing to industry studies and his own training and experience. He can discuss how to avoid cross-contamination, why it should be avoided, and its potential sources. But without personally examining the hands or gloves of the officer who handcuffed the Defendant, the seat of the squad car that the Defendant was transported in, the surfaces of the holding cell where the Defendant was located, the booking area of the precinct where the Defendant was brought, or any chair the Defendant may have sat in while at the police station, Howard does not have the requisite information that would make

an expert opinion regarding cross-contamination in this case appropriate. Therefore, this Court grants in part and denies in part the Government's motion to bar the testimony of Howard.

**CONCLUSION**

For the reasons stated herein, this Court grants in part and denies in part the Government's to bar the testimony of Steven Howard (Dkt. No. 83).

Virginia M. Kendall
United States District Court Judge
Northern District of Illinois

Date: June 9, 2014